IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:19-CV-657-WKW [WO] |
| ALLSTATE BEVERAGE COMPANY, LLC, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The Equal Employment Opportunity Commission (EEOC) brings this lawsuit on behalf of Jimmy Freeman against his former employer, Allstate Beverage Company, LLC (Allstate), alleging violations of Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*. The EEOC contends that Allstate discriminated against Mr. Freeman by failing to accommodate his disability and by wrongfully terminating his employment because of his disability.

In a prior Order, Allstate's motion for summary judgment (Doc. # 43) was granted on the EEOC's ADA accommodation claim and was denied on the EEOC's ADA wrongful termination claim. (Doc. # 69.) The Order stated that an opinion would follow. This is the opinion.

## I.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  Personal jurisdiction and venue are not contested.

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*  Alternatively, a movant without a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . .  [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

2

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

### III.  BACKGROUND

Allstate is an alcoholic beverage distribution business. It operates a 120,000-square-foot warehouse in Montgomery, Alabama, where Mr. Freeman worked from 2011 until his termination on June 2, 2018. (Doc. # 45-1 at 139 (Pl. Dep.).)[1]

Mr. Freeman was Allstate's point-of-sale (POS) warehouse administrator in the Montgomery facility. The POS warehouse was used to temporarily store marketing materials from manufacturers prior to distribution to retailers. Those materials included large advertising signs and displays for retail stores, branded retail coolers of all sizes, and other promotional items of varying size and weight. (Doc. # 45-1 at 139–40; Doc. # 52-5 at 42.) As the POS warehouse administrator, Mr. Freeman's responsibilities included pulling orders for marketing materials (*e.g.*, coolers, signs, displays) and pushing wheeled carts, loaded with these items, across the warehouse about the length of a football field, to stage them for pickup. (Doc.

---

[1] Where a deposition is cited, the cited pages refer to the deposition pages, and not to the pagination assigned in CM/ECF.

# 45-1 at 132–34, 260–61; Doc. # 52-5 at 134.)  The loaded carts weighed up to 100 pounds depending on the load.  According to Mr. Freeman, he pushed or pulled a loaded cart about ten times a day.  (Doc. # 45-1 at 133–34.)  Mr. Freeman also testified that the job required lifting and moving heavier items weighing forty to fifty pounds approximately "five times per day."  (Doc. # 45-1 at 131.)

Mr. Freeman's job also required certification as a forklift operator.  He used forklifts or pallet jacks to lift items that were on a pallet or were too heavy to lift manually.  (Doc. # 45-1 at 148–49.)

In early March 2018, Mr. Freeman had a pulmonary embolism and was hospitalized from March 5–7, 2018.  He also was suffering from supraventricular tachycardia (SVT) and deep vein thrombosis (DVT).  (Doc. # 45-1 at 49; Doc. # 45-1, Ex. 2 at 14–15.)  According to his treating physician, Jean Crepault, M.D., in early March 2018, Mr. Freeman's pulmonary embolism, SVT, and DVT affected his circulatory and respiratory functions.  (Doc. # 52-16 at ¶¶ 8, 11, 14.)

Dr. Crepault projected that Mr. Freeman would feel the "after-effects" of DVT, SVT, and pulmonary embolism (which he described as "weakness and fatigue") "until around early August 2018."  Notwithstanding these after-effects, Dr. Crepault opined that Mr. Freeman was healthy enough to return to his job at Allstate on May 2, 2018, but with restrictions.  (Doc. # 52-16 at ¶¶ 7, 10, 14.)  Dr. Crepault restricted Mr. Freeman from lifting, transferring, or carrying more than forty pounds and from pushing or pulling loaded carts.  (Doc. # 44 at 11; Doc. # 45-1 at 173, 215.)

Additionally, the EEOC's vocational expert concluded that "Dr. Crepault's continued restrictions beyond May 2, 2018 would not have substantially limited Mr. Freeman as compared to the average working person in the general population." (Doc. # 45-1, Ex. 9 at 7.)  Mr. Freeman also believed that by May 2, 2018, he "could do most anything" and "probably didn't [even] need [Dr. Crepault's] restrictions" by mid-June 2018.  (Doc. # 45-1 at 136–37, 174–75, 232.)

Allstate, however, felt otherwise.  Allstate believed that Mr. Freeman could not safely return to work because it considered lifting and pushing carts to be essential functions of his job.  (Doc. # 52-38.)  Allstate ultimately terminated Mr. Freeman's employment on June 22, 2018, when he did not provide a fitness-for-duty certification from a physician.  (Doc. # 52-38.)

Mr. Freeman filed a charge of discrimination with the EEOC, alleging disability discrimination in violation of Title I of the ADA.  (Doc. # 45-2.)  The EEOC determined there was reasonable cause to believe that Allstate had violated the ADA.  It invited Allstate to participate in conciliation efforts.  (Doc. # 45-2 at 101.)  Those efforts failed, and the EEOC filed this lawsuit.

## IV.  DISCUSSION

The EEOC brings two claims under the ADA.  It contends that Allstate discriminated against Mr. Freeman by failing to accommodate his disability and by wrongfully terminating his employment because of his disability.  Allstate moved for summary judgment on both claims.  It also moved for summary judgment on the

5

EEOC's requested relief for back pay and front pay, invoking the affirmative defense of failure to mitigate damages.

The ADA prohibits employers from discriminating "against a qualified individual on the basis of a disability" in the "terms, conditions, [or] privileges of employment." 42 U.S.C. § 12112(a).  Where a plaintiff relies on circumstantial evidence to prove an ADA disability discrimination claim at the summary judgment stage, the claim is evaluated "under the familiar *McDonnell Douglas* burden-shifting framework that governs Title VII employment-discrimination claims."  *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021) (internal footnote and citation omitted); *see also Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007) ("[T]he burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims." (citations and quotation marks omitted)).

Under that framework, a plaintiff first must establish a prima facie case of discrimination.  A plaintiff shows a prima facie case of employment discrimination under the ADA through proof that, "at the time of the adverse employment action, he had a disability, he was a qualified individual, and he was subjected to unlawful discrimination because of his disability."  *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014).  On an accommodation claim, "an employer's failure to reasonably accommodate a disabled individual itself constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,'

and unless the employer can show undue hardship." *Holly*, 492 F.3d at 1262.  If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Id.* (citation omitted).  If the employer satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason is "merely a pretext for discrimination."  *Id.* (citation omitted).

The discussion proceeds in three parts.  Parts IV.A. and IV.B. explain why summary judgment was granted on the accommodation claim and denied on the wrongful termination claim.  Part IV.C. explains why Allstate's affirmative defense of failure to mitigate damages will be carried with the case to trial.

## A.   The ADA Accommodation Claim

The ADA accommodation claim resolves on the disability prong of the prima facie case.  As argued by Allstate, the EEOC has not raised a genuine dispute of material fact that Mr. Freeman had a disability on May 2, 2018, when Allstate refused to allow him to return to work with medical restrictions on lifting more than forty pounds and moving loaded carts.  The EEOC's contrary arguments lack merit.

### 1.   *Whether Mr. Freeman Had an ADA Disability*

A plaintiff may be disabled under the ADA in one or more of three ways— having an actual disability, having a record of a disability, or being regarded as disabled.  42 U.S.C. § 12102(1)(A)–(C).  Here, the EEOC is proceeding under all three prongs.  (Doc. # 54 at 28.)

Allstate argues that there is an absence of evidence that Mr. Freeman suffered from an actual disability or had a record of a disability on May 2, 2018, when his physician cleared him to return to work with restrictions.  Allstate also argues that, as a matter of law, the EEOC cannot invoke the regarded-as disability prong for an accommodation claim because an employee may not receive a reasonable accommodation when his employer only perceives that he has a disability.  Because Allstate is correct on all points, summary judgment was granted in Allstate's favor on the accommodation claim.

### a.   Actual Disability

A disability covered under the ADA includes a "physical impairment" that "substantially limits one or more of an individual's major life activities."  42 U.S.C. § 12102(1)(A).  This definition encompasses three requirements.  First, the employee must show that he suffers from a physical impairment.  Second, the employee must identify the major life activity that is impaired.  Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  *Id.* at § 12102(2)(A).  Major life activities also encompass "the operation of a major bodily function," including respiratory and circulatory functions.  *Id.* at § 12102(2)(B).  Third, the employee must show that the impairment substantially limits the identified major life activity.  *Id.* at § 12102(1)(A).

8

Allstate contends that the EEOC has not demonstrated that Mr. Freeman was disabled within the meaning of the ADA.  It focuses on the second and third requirements above, arguing that the EEOC has not shown that Mr. Freeman's alleged physical impairments (deep vein thrombosis, pulmonary embolism, and supraventricular tachycardia, *see* Doc. # 52-16) "substantially limited one or more of his major life activities."  (Doc. # 44 at 9–10.)  Allstate contends that there is an absence of evidence that Mr. Freeman was impaired in the major life activities identified in subsection (2)(A) of § 12102, such as working and lifting.  (Doc. # 44 at 11.)  Emphasizing that "the test is not whether a plaintiff is substantially limited in [the] ability to perform a *particular job*," Allstate argues that the restrictions Mr. Freeman's physician imposed on May 2, 2018, from lifting over forty pounds and from moving loaded carts, cannot establish that he was substantially limited in working or lifting "as compared to the average working person."  (Doc. # 44 at 12.)

The EEOC regulations define the term "substantially limited" as:

(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii) [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1); *see also Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) ("Courts, including the Eleventh Circuit Court of Appeals . . . , frequently look to EEOC regulations to assess . . . whether a physical

impairment substantially limits a major life activity."). The EEOC regulations further instruct that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." § 1630.2(j)(1)(i).

The EEOC's response does not address Allstate's arguments challenging the lack of evidence that, as of May 2, 2018 (when Mr. Freeman's physician cleared him to return to work with restrictions), Mr. Freeman had a physical impairment that substantially limited one or more major life activities in subsection 2(A) of § 12102. (*See* Doc. # 51 at 33–35.) This silence is not surprising. For example, as concerns the major life activity of working, the EEOC's vocational expert opines that "Dr. Crepault's continued restrictions beyond May 2, 2018[,] would not have substantially limited Mr. Freeman as compared to the average working person in the general population." (Doc. # 45-1, Ex. 9 at 7.) Where a plaintiff's opposition to a dispositive motion fails to address arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 598 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). Based upon this well-established principle, the EEOC has abandoned reliance on the major life activities identified in subsection (2)(A) of § 12102, including working and lifting.

Instead, the EEOC takes a different tact by relying on subsection (2)(B) of § 12102. In its response to Allstate's summary judgment motion, the EEOC argues for the first time that Mr. Freeman's physical impairments substantially limited two major life activities identified in § 12102(2)(B), namely, circulatory and respiratory functions, so as to render him disabled. (Doc. # 51 at 33.) Allstate replies that there is an absence of evidence that Mr. Freeman was substantially limited as to his circulatory and respiratory functions as of May 2, 2018. (Doc. # 54 at 21.)

 Two recent Eleventh Circuit decisions demonstrate that the EEOC's evidence is lacking as to the requirement that the disability must exist at the time of the adverse employment action, which here is Allstate's alleged failure to accommodate Mr. Freeman's restrictions on May 2, 2018. *See Munoz v. Selig Enters., Inc.*, 981 F.3d 1265 (11th Cir. 2020); *Lewis v. City of Union City*, 934 F.3d 1169 (11th Cir. 2019). In *Munoz* and *Lewis*, the Eleventh Circuit held that, on the summary judgment record, the plaintiffs had not presented evidence establishing the duration of the claimed ADA disability.

In *Lewis*, the plaintiff claimed she was disabled under the ADA because of a permanent injury to her heart from a heart attack. 934 F.3d at 1179–80. Arguing that her heart condition substantially limited her ability to sleep and breathe, the plaintiff testified that she experienced "periodic shortness of breath," which her primary care doctor testified "could" affect her ability to sleep. *Id.* at 1180 (alteration adopted). However, because the plaintiff introduced no evidence of "the

11

severity, frequency, and *duration* of these episodes," the court held she did not provide sufficient evidence to show she was disabled under the ADA. *Id.* at 1180–81 (emphasis added).

The next year in *Munoz*, relying on *Lewis*, the Eleventh Circuit held that the plaintiff had not raised a genuine dispute of material fact that her physical impairments substantially limited her ability to sleep and work. *See Munoz*, 981 F.3d at 1273. The summary judgment record was bereft of "evidence of the timing, frequency, and *duration* of [the plaintiff's] impairments." *Id.* (emphasis added). Because there was no evidence of "how long" the plaintiff endured her symptoms, the Eleventh Circuit could not "assess whether her impairments substantially limited her ability to work or sleep as compared to most people in the general population." *Id.* (citing *Lewis*, 934 F.3d at 1180–81). Because the plaintiff had not demonstrated that she was disabled, the Eleventh Circuit affirmed the district court's grant of summary judgment to the defendant on the plaintiff's ADA claims. *Id.* at 1274.

To support its position that Mr. Freeman had an actual disability, the EEOC relies upon Mr. Freeman's treating physician's declaration, which the EEOC obtained after Allstate filed its summary judgment motion. Allstate argues that Dr. Crepault's declaration does not establish that, "at the time of [Mr.] Freeman's release with restrictions in May" 2018, that his impairments still substantially limited his respiratory and circulatory functions. (Doc. # 54 at 19.) Allstate is correct that

impairments substantially limiting circulatory and respiratory functions in early March do not prove a disability in May or June.

Dr. Crepault's declaration fails to raise a genuine dispute of material fact that Mr. Freeman was substantially limited in his circulatory and respiratory functions at the relevant time—when he was cleared to return to work with restrictions on May 2, 2018. Dr. Crepault opines that three of Mr. Freeman's medical conditions substantially affected his circulatory and respiratory functions: deep vein thrombosis (DVT), supraventricular tachycardia (SVT), and pulmonary embolism.[2] Dr. Crepault explains that Mr. Freeman's DVT "lasted from at least February 26, 2018, . . . until around early March 2018, when Mr. Freeman was hospitalized," that Mr. Freeman's "acute pulmonary embolism occurred on March 5, 2018," and that his SVT "began at least by March 5, 2018." (Doc. # 52-16 at ¶¶ 6, 9, 12.) Dr. Crepault explains that, as compared to an average healthy individual, DVT "substantially affected [Mr. Freeman's] circulatory functions" and SVT and the pulmonary embolism "substantially affected his circulatory and respiratory functions."[3] (Doc. # 52-16 at ¶¶ 8, 11, 14.)

---

[2] Dr. Crepault also declares that Mr. Freeman experienced hypertension from February 26 to April 23, 2018, but he does not state that Mr. Freeman's hypertension substantially limited any major life activity. (Doc. # 52-16 at ¶ 15.)

[3] Dr. Crepault says that a blood clot in the deep veins of Mr. Freeman's left leg caused Mr. Freeman's DVT and that the DVT then "caused a pulmonary embolism" when the blood clot traveled to Mr. Freeman's lungs and pulmonary artery, "causing a blockage." (Doc. # 52-16 at 5.) Dr. Crepault reports that Mr. Freeman's pulmonary embolism "substantially affected his circulatory and respiratory functions" because the blockage that caused the pulmonary embolism

Based on Dr. Crepault's declaration, Mr. Freeman's DVT "substantially affected his circulatory functions" from "at least February 26, 2018," until "around early March 2018," and Mr. Freeman's SVT and pulmonary embolism "substantially affected his circulatory and respiratory functions" by at least March 5, 2018.  (Doc. # 52-16 at ¶¶ 6, 8, 11, 14.)  But notably absent is an opinion from Dr. Crepault that the debilitating symptoms of DVT, SVT, and pulmonary embolism that affected Mr. Freeman's circulatory and respiratory functions extended temporally to early March 2018 and after.  Instead, Dr. Crepault says that he projected that Mr. Freeman would feel the "after-effects" of DVT, SVT, and pulmonary embolism "until around early August 2018."  Dr. Crepault describes the after-effects as "weakness and fatigue" (Doc. # 52-16 at ¶¶ 7, 10, 14), but he does not opine that the lingering weakness and fatigue following the onset of Mr. Freeman's DVT, SVT, and pulmonary embolism substantially affected Mr. Freeman's circulatory or respiratory functions.   Dr. Crepault's declaration stops conspicuously short of stating that Mr. Freeman was substantially limited as to circulatory and respiratory functions as of May 2, 2018. The absence of evidence as to the duration of the substantial limitations on Mr. Freeman's circulatory and respiratory functions is fatal to the EEOC's ADA accommodation claim.  The medical evidence thus cannot raise a genuine dispute of material fact that Mr. Freeman suffered from impairments that substantially limited

---

resulted in "abnormally low levels of blood oxygen," contributed to his "dizziness and numbness," and "caused him to have SVT, an abnormally fast or erratic heartbeat."  (Doc. # 52-16 at 3.)

the major life activities of circulatory and respiratory functions beginning in May 2018.

To defeat summary judgment on the question of whether Mr. Freeman was disabled, the EEOC need not rely only on medical evidence.  Mr. Freeman's own testimony could suffice.  However, the EEOC does not point to any testimony from Mr. Freeman from which it can be inferred that he was substantially limited in his circulatory and respiratory functions.  In its reply brief, Allstate correctly points out the EEOC's position that Mr. Freeman was substantially limited as to his circulatory and respiratory functions (Doc. # 51 at 20–21) contradicts Mr. Freeman's testimony about his condition in May 2018.  For example, Mr. Freeman testified that by May 2, 2018, he "could do most anything" and "probably didn't [even] need [Dr. Crepault's] restrictions" by mid-June.   (Doc. # 45-1 at 136–37, 174–75, 232.) Additionally, Mr. Freeman's declaration, produced in response to Allstate's summary judgment motion, says that after his discharge from the hospital on March 7, 2018, Mr. Freeman "continued to experience symptoms" from his pulmonary embolism and related medical conditions.  (Doc. # 52-10 at 4.)  However, he does not indicate how long he continued to experience symptoms nor does he describe those symptoms.  The EEOC finds itself in much the same position as the *Munoz* plaintiff, who provided scant evidence of the duration of her alleged impairments. *See Munoz*, 981 F.3d at 1273.

Even under the broad construction of the definition of an ADA disability, the evidence cannot raise a genuine dispute of material fact that Mr. Freeman suffered from physical impairments that substantially limited the major life activities of circulatory and respiratory functions as of May 2, 2018.  The EEOC thus has not shown that Mr. Freeman suffered an actual disability under the ADA.

### b.   Record of Impairment

The EEOC also submits that Mr. Freeman is disabled under the ADA because he had a record of an impairment.  (Doc. # 51 at 33–35); § 12102(2)(B).  "[T]he record-of-impairment standard is satisfied only if [the plaintiff] *actually* suffered a physical impairment that substantially limited one or more of h[is] major life activities."  *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999) (emphasis added).  As discussed in the preceding section, the EEOC has not raised a genuine dispute of material fact that the after-effects of Mr. Freeman's DVT, SVT, and pulmonary embolism in fact substantially limited his circulatory or respiratory functions on May 2, 2018.  The EEOC thus has not demonstrated that Mr. Freeman satisfies the definition of disability under the record of impairment standard.

### c.   Regarded As Having a Disability

The EEOC also argues that Mr. Freeman qualifies as disabled under the ADA because Allstate regarded him as disabled.  (Doc. # 51 at 35–37); § 12102(3)(A).  However, as Allstate correctly argues (Doc. # 54 at 22 n.18), an ADA claim for

failure to accommodate cannot proceed under the "regarded as" definition of a disability.

Under the ADA, a covered employer "need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section."   42 U.S.C. § 12201(h). Subparagraph (C) of 12102(1) is the "regarded as" definition of a disability.  Relying on § 12201(h), the Eleventh Circuit has explained that "the ADA does not require an employer to provide reasonable accommodations where an employee is only regarded as disabled." *Rice v. Guardian Asset Mgmt. Inc.*, No. 21-13188, 2022 WL 1763816, at *1 (11th Cir. June 1, 2022) (holding that an employer "need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who" is solely "regarded as" being disabled (citing § 12201(h) and cross-referencing § 12102(1)(C))); *Billups v. Emerald Coast Utils. Auth.*, 714 F. App'x 929, 936 n.4 (11th Cir. 2017) ("[T]here is no requirement to provide reasonable accommodations where an employee is only regarded as disabled" (citing § 12201(h))).

Because the ADA does not require an employer, like Allstate, to accommodate individuals who are regarded as disabled, the EEOC's accommodation claim predicated on the "regarded as" definition of disability fails as a matter of law.

**2.**   *Summary*

The EEOC has not raised a genuine dispute of material fact that Mr. Freeman was disabled under the ADA for his accommodation claim.  Accordingly, summary judgment was granted in favor of Allstate on this claim.

**B.**   <u>**ADA Wrongful Termination Claim**</u>

As for the wrongful termination claim, Allstate argues that the EEOC has not raised a genuine dispute of material fact on each element of the prima facie case or, alternatively, that the EEOC has not rebutted its legitimate reason for terminating Mr. Freeman's employment.  The EEOC counters those arguments.  For the reasons that follow, summary judgment was denied on this claim.

**1.**   *Whether Mr. Freeman Had an ADA Disability*

For the same reasons discussed in Part IV.A., Mr. Freeman's ADA wrongful termination claim cannot survive summary judgment on the theories that he had an actual disability or a record of impairment.  As the evidence does not raise a genuine dispute of material fact that Mr. Freeman had an actual disability that substantially limited his circulatory and respiratory functions when he was cleared to return to work on May 2, 2018, with restrictions, it likewise fails to establish that Mr. Freeman had an actual disability when he was terminated seven weeks later on June 22, 2018.

Unlike accommodation claims, however, wrongful termination claims under the ADA can be based on an employer's perception that an employee has a disability.  42 U.S.C. § 12201(h); *Dulaney v. Miami-Dade Cnty.*, 481 F. App'x 486, 489 (11th

18

Cir. 2012). In its summary judgment response brief, the EEOC argues that Allstate perceived that Mr. Freeman's medical conditions—namely, SVT, DVT, and pulmonary embolism—rendered Mr. Freeman disabled.

Under the ADA, an individual is "regarded as" disabled if he "establishes that he . . . has been subjected to an action prohibited under this chapter because of an actual or perceived physical . . . impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A)–(B). Under § 12102(3), "a plaintiff need demonstrate only that the employer regarded him as being impaired, not that the employer believed the impairment prevented the plaintiff from performing a major life activity." *Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 468 (11th Cir. 2012). Hence, "what matters for the 'regarded as' theory is whether [Allstate] perceived [Mr. Freeman] as impaired, not whether he was actually impaired." *Forsyth v. Univ. of Ala., Bd. of Trustees*, No. 20-12513, 2021 WL 4075728, at *4 (11th Cir. Sept. 8, 2021). And a "prohibited action" includes termination of employment. 29 C.F.R. § 1630.2(l)(1).

The Eleventh Circuit's decision in *Lewis* is instructive. *See* 934 F.3d at 1181. In *Lewis*, the Eleventh Circuit held that the plaintiff presented "ample evidence" to raise a genuine dispute of material fact whether her employer regarded her as disabled:

> Chief Odom himself was a witness to Ms. Lewis's heart attack. In his June 17 letter putting Ms. Lewis on leave, Assistant Chief Brown referred to her chronic conditions and instructed her to complete FMLA

19

paperwork, suggesting that he believed Ms. Lewis had a medical condition warranting medical leave.  Next, Assistant Chief Brown's July 1 letter forbade Ms. Lewis from returning to work until "everything is cleared up with your doctor," said that "your doctor's letter essentially makes it impossible for you to work or be at work," and concluded that Ms. Lewis could not return "until your doctor releases you for duty."  Assistant Chief Brown's July 6 email again referred to the possibility of Ms. Lewis taking leave under FMLA. Indeed, the department's own stated reason for putting Lewis on leave—that it feared for her safety in view of her heart condition— demonstrates the department's belief that Ms. Lewis's medical condition set her apart from other police officers.

*Id.*

The evidence upon which the EEOC relies is sufficiently analogous to the evidence in *Lewis* to overcome summary judgment on the theory that Mr. Freeman was disabled under the regarded-as prong of a disability.  The EEOC points to the following to show that Allstate regarded Mr. Freeman as disabled:  (1) the Allstate employee's visit to Mr. Freeman in the hospital in March 2018 to provide him with FMLA paperwork; (2) Allstate's April 27, 2018 letter to Mr. Freeman referencing his pulmonary embolism and SVT and requesting a fitness-for-duty certification from a treating physician (Doc. # 52-24); (3) Allstate's May 14, 2018 letter to Mr. Freeman, noting his "serious health condition" and informing him that Allstate could not "reinstate [his] position at this time" because his physician had not yet certified that he was "able to safely perform the essential functions of [his] position," (Doc. # 52-32); and (4) Allstate's June 19, 2018 letter, notifying Mr. Freeman that he would be terminated effective June 22, 2018, unless he provided a fitness-for-duty

certification confirming his ability to perform the essential functions of the job (Doc. # 52-38).

As in *Lewis*, Allstate's actions, construed in the light most favorable to the EEOC, are sufficient to show that Allstate terminated Mr. Freeman because it perceived him as having a physical impairment that prevented him from performing his job.  First, Allstate required Mr. Freeman to take FMLA leave for his medical conditions.  Second, Allstate's letters to Mr. Freeman reveal that Allstate considered his medical conditions serious enough to prevent him from performing his job.  Third, Allstate prohibited Mr. Freeman from returning to work without physician approval.  And fourth, Allstate terminated him when he did not provide a fitness-for-duty certification by June 22, 2018.

Allstate advances two counterarguments.  First, Allstate contends that it did not regard Mr. Freeman as disabled.  It cites, for example, the deposition testimony of Judy Graham, Allstate's human resources generalist in Montgomery, who testified that she was "not aware" that Mr. Freeman had a disability and only knew that he had a "heart condition."  (Doc. # 52-8 at 40–41.)  But this evidence raises, rather than eliminates, material factual disputes because Ms. Graham is the same individual who signed the April 27, May 14, and June 19 letters to Mr. Freeman recognizing his diagnosed pulmonary embolism and SVT, acknowledging his "serious health condition," and concluding that Mr. Freeman could not perform the essential functions of his job based upon his physician's restrictions.  (Doc. # 52-24,

52-32, and 52-38.)  The other evidence that Allstate cites (*see* Doc. # 54 at 22 n.19) likewise does little more than create factual issues for the jury to resolve.   A reasonable jury could credit and rely upon the EEOC's evidence to find that Allstate fired Mr. Freeman because it regarded him as disabled.

Second, Allstate argues that the regarded-as theory is not properly before the court because the EEOC "did not plead" a perceived disability claim under the ADA and thus its reliance at summary judgment on this theory is improper.  (Doc. # 54 at 22.)  The Complaint alleges that Mr. Freeman was hospitalized for a pulmonary embolism and had a disability.  (Doc. # 2 at ¶¶ 13–14.)  Allstate is correct that the Complaint does not specify under which of the three subparts of the ADA's definition of disability the claim is proceeding; however, the ADA's three-part definition of disability includes a person who is "regarded as" having the requisite impairment.  Allstate cites no authority that an ADA violation based on an as-regarded disability is a separate cause of action, rather than a theory by which to prove that a plaintiff has a qualifying disability for purposes of an ADA discrimination claim.  *See, e.g.*, *Kolovos v. Sheahan*, No. 97 C 4542, 1999 WL 1101919, at *4 (N.D. Ill. Nov. 30, 1999) ("We reject defendant's argument that we should preclude [the plaintiff] from advancing this theory because he failed to allege in his complaint that he was 'regarded as disabled.'  The Federal Rules do not require a plaintiff to plead his legal theory.").  Absent authority or persuasive argument on this point, the court declines to summarily dispose of the regarded-as theory.

22

Notably also, Allstate did not challenge the Complaint's allegations as impermissibly conclusory through a Rule 12(b)(6) motion.  Nor does Allstate now argue unfair surprise in having to defend the theory at the summary judgment stage, and it is doubtful that Allstate could do so, given that Allstate acknowledged Mr. Freeman's "serious health condition" (Doc. # 52-32) and terminated Mr. Freeman based on its perception that Mr. Freeman's physical impairments prevented him from performing the essential functions of his job (Doc. # 52-38).  On this record, the EEOC's claim that Mr. Freeman was terminated based upon a perceived disability is a plausible theory on the evidence, which means there is a genuine dispute of material fact for trial.

## 2.      *Whether Mr. Freeman Is a Qualified Individual*

The ADA defines the phrase "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8). However, to prevail under a "regarded as" theory, the EEOC must show that Mr. Freeman could perform the essential functions of his job *with no accommodation*s because, as discussed, employers do not have to accommodate individuals "regarded as" disabled.[4] 29 C.F.R. § 1630.2(o)(4); *see also Sierra v. Port Consol. Jacksonville,*

---

[4] The EEOC's argument that genuine disputes of material fact exist as to whether he could perform the essential functions of his job with a reasonable accommodation are not germane to the regarded-as theory.  (Doc. # 51 at 42–44.)

*L.L.C.*, No. 3:14-CV-1496-HES-JBT, 2016 WL 927189, at *7 (M.D. Fla. Mar. 4, 2016) ("It logically follows from this exception [*i.e.*, § 1630.2(o)(4)] that a plaintiff who proceeds only under the "regarded as" prong must demonstrate he is a qualified individual based on his ability to perform the essential functions of his job without reasonable accommodation.").  Hence, for the EEOC's ADA wrongful termination claim, it must show that Mr. Freeman is a qualified individual who can perform the essential functions of his job as POS warehouse administrator with no accommodations.

Allstate's arguments for summary judgment are twofold.  First, Allstate argues that the EEOC has not shown that Mr. Freeman's restrictions—that he refrain from lifting, transferring, or carrying more than forty pounds and from pushing or pulling loaded carts—permitted him to perform the essential functions of his job at the time of his termination on June 22, 2018.  (Doc. # 44 at 13.)  Second, Allstate argues that, by applying for social security disability insurance (SSDI) benefits and representing that he was totally disabled, Mr. Freeman has conceded that he cannot perform the essential functions of his job; so, according to Allstate, the EEOC is estopped from proving an essential element of its ADA wrongful termination claim. Each argument is discussed in turn and is rejected.

    a.    **Evidence Pertaining to the Essential Functions of the POS**
**Warehouse Administrator Position**

The EEOC has demonstrated that there is a genuine dispute of material fact
as to what the essential functions of the job of a POS warehouse administrator were
and whether Mr. Freeman's restrictions affected those essential functions.  (Doc.
# 51 at 39.)  "Essential functions" are "the fundamental job duties of the employment
position the individual with a disability holds or desires."  29 C.F.R. § 1630.2(n)(1).
Whether a job function is essential is analyzed case-by-case based on several factors.
*Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1200–01 (11th Cir. 2014); *see also Holly*,
492 F.3d at 1258.  These factors include "[t]he employer's judgment as to which
functions are essential," (2) "[w]ritten job descriptions," (3) "[t]he amount of time
spent on the job performing the function," and (4) the work experience of other
employees performing the same or similar jobs.  29 C.F.R. § 1630.2(n)(3); *see also
Samson*, 746 F.3d at 1201 (outlining the § 1630.2(n)(3) factors).

Allstate relies upon its written description of the essential functions of a POS
warehouse administrator position and employee testimony.  (Doc. # 44 at 22.)
Allstate has produced a written description stating that the essential functions of a
POS warehouse administrator are (1) "occasional (approximately five times per day)
lift[ing], carry[ing], transfer[ring] of 40–51# [pounds]" and (2) "repetitive pushing
and pulling of empty and fully loaded carts for distance of up to 300ft or more."
(Doc. # 45-1 at 205.)  Mr. Freeman estimated that he would push a loaded cart

"maybe ten" times a day (Doc. # 45-1 at 133–34) and that he lifted items weighing forty to fifty pounds approximately "five times per day." (Doc. # 45-1 at 131; *see also* Doc. # 45-3 at 72–73.) If this were the only evidence regarding the functions of Mr. Freeman's job, Allstate's motion might prevail. However, as the EEOC points out, there is conflicting evidence about which functions of the POS warehouse administrator job are essential. The following evidence relied upon by the EEOC is illustrative.

First, the EEOC has produced three other versions of the position description for the POS warehouse administrator. None of these versions lists lifting forty or more pounds or pushing fully loaded carts in the "responsibilities" section. (Doc. # 52-35 at 2–6.) Second, Mr. Freeman testified that, at Allstate's quarterly safety meetings, Allstate's managers encouraged employees, like Mr. Freeman, to not lift heavy items on their own and to use a team-lift approach instead. (Doc. # 45-1 at 267–70; Doc. # 52-3 at 48–50.) Third, the employee who took over Mr. Freeman's position testified that he lifted, carried, or transferred forty to fifty pounds three to four times a week, not five times per day as set out in Allstate's written description of the essential functions of a POS warehouse administrator. (Doc. # 52-28.) Fourth, Mr. Freeman has explained that he had other equipment available to help him lift, transfer, and move items in the warehouse, including a motorized pallet jack. (Doc. # 52-10 at 3.)

On summary judgment, the facts and their inferences must be viewed in the light most favorable to the EEOC.  The foregoing and other evidence upon which the EEOC relies (*see* Doc. # 51 at 39–45) are sufficient to create a genuine dispute of material fact as to whether lifting forty or more pounds or pushing fully loaded carts is an essential function of the job of a POS warehouse administrator.

### b.   Judicial Estoppel

Allstate argues that Mr. Freeman's representations in his application for SSDI benefits estops the EEOC from arguing that Mr. Freeman is a qualified individual under the ADA.  Allstate contends that Mr. Freeman is not a qualified individual because by applying for SSDI benefits, he attested that he could not perform any gainful employment for twelve months, *i.e.*, that he was totally disabled.  According to Allstate, the representations Mr. Freeman made during his SSDI proceedings contradict the EEOC's claim that Mr. Freeman could perform the job's essential functions at the time of his termination and that the EEOC is estopped from taking a contrary position on Mr. Freeman's behalf.  The EEOC argues that estoppel does not apply, principally because Mr. Freeman's claim for SSDI benefits was denied. (Doc. # 51 at 37–38.)  The EEOC's argument rests on the premise that where the earlier court has rejected the SSDI claimant's assertion of disability, estoppel should not apply because the representations do not have judicial imprimatur.

Judicial estoppel is an equitable doctrine designed to "prevent the perversion of the judicial process and protect its integrity by prohibiting parties from

deliberately changing positions according to the exigencies of the moment." *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (cleaned up).  It "rests on the principle that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."  *Id.* at 1180–81 (citation and quotation mark omitted).   In the Eleventh Circuit, where the party raising estoppel was not a party to the prior proceeding, judicial estoppel applies when "(1) the party took an inconsistent position under oath in a separate proceeding, and (2) these inconsistent positions were calculated to make a mockery of the judicial system." *Id.* (citation and quotation marks omitted).

Both parties cite *Cleveland v. Policy Management System*, 526 U.S. 795 (1999), which is instructive.  In *Cleveland*, the Supreme Court held that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing ADA claims."  526 U.S. at 798.  The Supreme Court recognized that there are "many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.* at 803.  For instance, where "an individual has merely applied for, but has not been awarded, SSDI benefits, any inconsistency in the theory of the claims is the kind of inconsistency that our legal system, which allows for liberal rules of pleading, normally tolerates." *See id.* at 805.  However, "an ADA plaintiff cannot simply ignore [his] SSDI contention that []he was too disabled to work." *Id.* at 798.  Rather, "[t]o survive a defendant's motion for summary judgment," an ADA

plaintiff "must explain why that SSDI contention is consistent with h[is] ADA claim that []he could perform the essential functions of h[is] previous job, at least with reasonable accommodation." *Id.* (quotation marks omitted). That "explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." *Id.* at 807.

In *Cleveland*, the ADA plaintiff, who had qualified for SSDI benefits, sought to explain the discrepancies between her representations to the Social Security Administration (SSA) that she was "totally disabled" and her contrary position espoused in her ADA lawsuit. She contended that her "SSDI statements were 'accurate statements' if examined 'in the time period in which they were made,'" *id.* at 807, implying that her health had deteriorated during the relevant time frame. The Court concluded that judicial estoppel was inappropriate on summary judgment and that the parties "should have the opportunity in the trial court to present, or to contest the[] explanations, in sworn form where appropriate." *Id.*

### i.     *Whether Mr. Freeman's Position Under Oath in his SSDI Proceeding Is Inconsistent with the EEOC's Position in this Lawsuit*

The first consideration for assessing judicial estoppel is whether Mr. Freeman's statements in his SSDI application are inconsistent with the EEOC's ADA wrongful termination claim in this lawsuit.

In his SSDI application submitted on July 30, 2018, Mr. Freeman stated, "I became unable to work because of my disabling condition on March 5, 2018," and "I am still disabled." (Doc. # 45-1 at 227.) Mr. Freeman also "affirm[ed] that all information [he] ha[d] given in connection with this claim is true."[5] (Doc. # 45-1 a 228.) In this lawsuit to support the ADA wrongful termination claim, the EEOC's theory is that Mr. Freeman was able to perform his job with Allstate on June 22, 2018, with no accommodations.[6] (Doc. # 45-1 at 136–37, 174–75, 232 (testifying that he "probably didn't [even] need [Dr. Crepault's] restrictions" by mid-June).) On the summary judgment record, Mr. Freeman's claim of total disability in his SSDI application contradicts the EEOC's claim in this lawsuit that Mr. Freeman is a qualified individual under the ADA.

### ii.   *Whether the EEOC's Filing of this Lawsuit Made a Mockery of the Judicial System*

The second consideration for assessing judicial estoppel is whether there is evidence that the EEOC's filing of this lawsuit made a mockery of the judicial system. "[T]o determine whether a plaintiff's inconsistent statements were

---

[5] These representations are reflected in the SSA application summary of the statements Mr. Freeman made in support of his claim for SSDI benefits.

[6] On the ADA wrongful termination claim, because the EEOC is proceeding under the theory that Allstate perceived Mr. Freeman to be disabled, the EEOC must show that Mr. Freeman was able to perform the essential functions of his job without any accommodations on June 22, 2018, the date Allstate terminated his employment.

calculated to make a mockery of the judicial system, a court should look to all the facts and circumstances of the particular case." *Slater*, 871 F.3d at 1185. Those circumstances include "whether . . . the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (citation and internal quotation marks omitted). "Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity." *Id.* at 750–51 (internal citation and quotation marks omitted); *accord Cleveland*, 526 U.S. at 805.

First, Mr. Freeman did not convince the SSA that he was disabled within the meaning of the SSA. *See* 42 U.S.C. § 423(d)(1)(A) (defining a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"). The SSA determined that Mr. Freeman was "not disabled under [its] rules." (Doc. # 45-1 at 231.) In *Cleveland* and in other cases cited by Allstate— *e.g., Kurzweg v. SCP Distributors, LLC*, 424 F. App'x 840 (11th Cir. 2011), and *Flores v. Hyundai Motor Mfg. Ala., LLC*, No. 2:19-CV-830-WKW, 2021 WL 1910776 (M.D. Ala. May 12, 2021)—the estopped ADA plaintiff was awarded SSDI benefits, but here Mr. Freeman was denied SSDI benefits. On the summary

31

judgment facts, Allstate has not shown that the EEOC's filing of this lawsuit is a "threat to judicial integrity." *New Hampshire*, 532 U.S. at 750; *see also Cleveland*, 526 U.S. at 805 ("[I]f an individual has merely applied for, but has not been awarded, SSDI benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system."); *Williams v. Hill*, No. 1:20-CV-0186-JPB-JSA, 2022 WL 907789, at *25 (N.D. Ga. Jan. 31, 2022) (concluding that "the *Cleveland* decision also stated that a person's act of merely applying for SSDI benefits, without being awarded benefits, should not be considered unduly prejudicial to any claim brought under the ADA, because plaintiffs are entitled to pursue alternative theories of relief"), *report and recommendation adopted*, No. 1:20-CV-0186-JPB-JSA, 2022 WL 1715212 (N.D. Ga. Mar. 31, 2022).

Second, Mr. Freeman attempts to reconcile some of his statements on his SSDI application.  For example, Mr. Freeman testified that he mistakenly thought that the question about the onset date of his disability was a question asking the last date he had worked, testifying that he "made a mistake on the date of . . . when [he] was fully disabled."  (Doc. # 45-1 at 234–35.)  Whether Mr. Freeman's explanation is credible will be for the jury to decide, not the court on summary judgment.  *See Cleveland*, 526 U.S. at 107.  Wholesale exclusion of the EEOC's ADA wrongful termination claim on summary judgment based on judicial estoppel is not warranted.

The EEOC is not judicially estopped from claiming that Mr. Freeman was able to perform his job as POS warehouse administrator when he was fired, even

though he claimed in his SSDI application that he became disabled before his employment ended.

### 3.   *Whether Mr. Freeman Was Discriminated Against Because of His Perceived Disability*

Arguing for and against a summary judgment finding that Mr. Freeman was discriminated because of his disability, the parties frame their arguments in relation to the "but-for" causation standard.  At least one non-precedential Eleventh Circuit decision has said that "the third prong of the prima facie case—requiring proof that the employer discriminated against the plaintiff because of his disability—requires the plaintiff to show that the discriminatory motivation was the but-for cause of the adverse employment action."  *Collier v. Harland Clarke Corp.*, 820 F. App'x 874, 879 (11th Cir. 2020) (citing *Holly*, 492 F.3d at 1263 n.17); *but see Mazzeo*, 746 F.3d at 1270 (providing that but-for causation under the Age Discrimination in Employment Act is the plaintiff's trial burden) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)).  The analysis proceeds under the parties' framing, but no finding is made as to whether the framing is suitable at the summary judgment stage.

"But-for" causation means that disability "was the 'reason' that the employer decided to act."  *Gross*, 557 U.S. at 176; *see also Phillips v. PPG Indus., Inc.*, No. 5:14-CV-1274-VEH, 2015 WL 7458687, at *10 n.6 (N.D. Ala. Nov. 24, 2015) (noting that *Burrage v. United States*, 571 U.S. 204 (2014) "eliminated any lingering

doubt about whether the reasoning in *Gross* . . . applies to the ADA"). "But-for" causation also "means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020). As long as disability "was one but-for cause" of the adverse employment action, "that is enough to trigger the law." *Id.*

Allstate argues that the EEOC cannot show that Mr. Freeman's disability was the but-for cause for his termination, pointing to Mr. Freeman's testimony that "possibly" his age, as well as his high pay, "could have" also factored into Allstate's decision to terminate him. (Doc. # 45-1 at 26, 28.) Countering this argument, the EEOC contends that "Allstate made no secret of the fact that it terminated Freeman because of his disability." (Doc. # 51 at 58–59.) Relying on Allstate's June 19, 2018 letter to Mr. Freeman, the EEOC argues that Allstate's "express, written reason for terminating Freeman was his physician-imposed restrictions, which themselves were the product of Freeman's disability." (Doc. # 51 at 59; *see also* Doc. # 52-38 (letter).) It further contends that Mr. Freeman's belief that pay and age discrimination also could have been factors does not negate the evidence that Mr. Freeman's disability was the determinative reason, even if it was not the sole reason, for Allstate's decision to terminate him. (Doc. # 51 at 59.) The EEOC has the better argument.

The evidence creates a genuine dispute of material fact as to whether Mr. Freeman's perceived disability was the but-for cause of his termination. The letters

from Allstate to Mr. Freeman, dated May 14, 2018 and June 19, 2018, confirm that Allstate terminated Mr. Freeman's position because it perceived that his medical conditions prevented him from performing the essential functions of his job as a POS warehouse administrator.  Allstate expressed that it could not accommodate his physician-imposed restrictions on lifting more than forty pounds and transporting loaded carts based on the "frequency of these tasks and the fact that there is only one POS Warehouse Administrator position in Montgomery."  (Doc. # 52-32 at 2.)  It considered Mr. Freeman's physical restrictions as affecting essential functions of the POS warehouse administrator position, and Allstate's stated reason for Mr. Freeman's termination was that he did not submit a physician certification that he could "safely perform the essential functions of [his] position."  (Doc. # 52-38.)

As to whether the but-for cause of Mr. Freeman's termination was instead his age or his high pay, Allstate fails to show that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  Neither Mr. Freeman's age nor his pay is mentioned in Allstate's letters to Mr. Freeman.  Also, Mr. Freeman qualified his testimony about his belief that his increased age and high pay may have factored in the termination calculus by prefacing the testimony with "possibly" and "could have."  (Doc. # 45-1 at 26, 28)  During his deposition, he also espoused that he was being "ask[ed] . . . to speculate" about whether Allstate considered his age and pay when terminating him.  (Doc. # 45-1 at 26.)  This equivocal testimony, which is unconfirmed from any other source, is not the stuff that summary judgment is made

of.  Allstate cannot obtain summary judgment where there is evidence that Mr. Freeman's disability "was one but-for cause" of his termination, *Bostock*, 140 S. Ct. at 1739, even if Allstate could point to evidence that there may have been other causes too.

The evidence, construed in the light most favorable to the EEOC, raises a genuine dispute of material fact as to each element of the prima facie case.

**4.** *Whether Allstate Has Shown a Legitimate, Non-discriminatory Reason for Mr. Freeman's Termination*

Allstate argues that its reason for Mr. Freeman's termination—his inability to perform the essential functions of the position—is a legitimate reason.  On the summary judgment record, this reason cannot carry the day.

An employer has a legitimate, non-discriminatory reason for terminating a disabled employee who can no longer perform the essential functions of his job.  *See E.E.O.C. v. Eckerd Corp.*, No. 1:10-CV-2816-JEC, 2012 WL 2726766, at *11 (N.D. Ga. July 9, 2012).  However, because there is a genuine dispute of material fact whether Mr. Freeman's restrictions were essential functions of his job, the legitimacy of the proffered reason is for trial, and the *McDonnell Douglas* analysis comes to a close.  *See Boone v. Rumsfeld*, 172 F. App'x 268, 273 (11th Cir. 2006) (per curiam) ("[B]ecause a genuine question of fact exists as to the essential functions of an HMER [heavy mobile equipment repairer], the district court erred in

36

finding that the [employer's] legitimate, nondiscriminatory reason for [the plaintiff's] termination was not pretextual.").

### 5.   *Summary*

The EEOC has raised a genuine dispute of material fact as to whether Allstate terminated Mr. Freeman because it regarded Mr. Freeman as disabled.   Thus, summary judgment was denied on Mr. Freeman's ADA wrongful termination claim.

## C.   Allstate's Affirmative Defense of Mitigation of Damages

As to the EEOC's requested equitable relief for back pay and front pay under the ADA, Allstate argues that Mr. Freeman did not mitigate his damages by using reasonable diligence to find substantially equivalent employment after his termination.  (Doc. # 44 at 23–25; Doc. # 54 at 23–24.)  The EEOC does not dispute that Mr. Freeman remained unemployed after his termination, but it argues that his initial failure to obtain employment was not for lack of trying.  (Doc. # 51 at 59–61.) The EEOC points to Mr. Freeman's testimony that, shortly after Allstate fired him, he applied for jobs at Publix, Wal-Mart, and Enterprise Rent-a-Car and that he followed up with managers as to his applications at Publix and Wal-Mart.  (Doc. # 45-1 at 63–74.)  He also posted his resume on Indeed.com.  (Doc. # 45-1 at 74.) The EEOC also cites Mr. Freeman's testimony that his termination from Allstate made him feel "emasculated" and caused him to suffer diagnosed depression because he "could not continue to provide for [his] household."  (Doc. # 45-1 at 50–52.)

"The purpose of relief under the federal employment anti-discrimination laws is to make persons whole for injuries suffered on account of unlawful employment discrimination." *E.E.O.C. v. Massey Yardley Chrysler Plymouth Inc.*, 117 F.3d 1244, 1251 (11th Cir. 1997) (Age Discrimination in Employment Act) (citation and quotation marks omitted).  To achieve the goal of making the injured person whole, a prevailing party under the ADA is "presumptively entitled" to back pay and to either reinstatement or front pay.[7]  *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1528 (11th Cir. 1991) (Title VII) (superseded by statute on other grounds); 42 U.S.C. § 12117(a) (adopting 42 U.S.C. § 2000e-5's enforcement mechanisms as those for the ADA).  An injured employee though has a "duty to mitigate his damages by being reasonably diligent in seeking substantially equivalent employment," and, where the employer raises the affirmative defense that the employee failed to mitigate losses, the employer has the burden "to prove the [employee] lacked diligence." *Massey*, 117 F.3d at 1251.  An exception lies to the plaintiff's mitigation requirement "where the defendant's discriminatory conduct resulted in the disability that prevents the plaintiff from finding other employment." *Lathem v. Dep't of Child. & Youth Servs.*, 172 F.3d 786, 794 (11th Cir. 1999).

---

[7] In the Eleventh Circuit, back pay and front pay awards are equitable relief, which, absent the parties' consent for a jury determination, are for the court to decide.  *Holland v. Gee*, 677 F.3d 1047, 1064 n.8 (11th Cir. 2012) (citing *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1184 (11th Cir. 2010)).

Allstate has not met its summary judgment burden of showing that there is no genuine dispute of material fact on its affirmative defense.  Mr. Freeman testified that he did apply for employment after his termination, and Allstate has not argued that the positions for which he applied were substantially inequivalent to his job as POS warehouse administrator.  Allstate also has pointed to no evidence that, after his termination, Mr. Freeman passed over job offers or opportunities for substantially equivalent employment. Also, a reasonable jury could find that Allstate's act of terminating Mr. Freeman caused him to suffer depression that prevented him from obtaining new employment.  On this record, damage mitigation cannot be resolved on summary judgment.  Alternatively, because mitigation affects the available remedies and not liability, the better course is to proceed to a verdict, rather than to address remedies at summary judgment.  *See generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (observing that the trial court may "deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial") (citation omitted).

## V.  CONCLUSION

The EEOC brings two ADA claims against Allstate on behalf of Allstate's former employee, Mr. Freeman.  A prior Order granted Allstate's motion for summary judgment on the EEOC's ADA accommodation claim and denied summary judgment on the EEOC's ADA wrongful termination claim.  (Doc. # 69.) For the reasons set out in this Memorandum Opinion, the ADA accommodation

39

claim fails based on the absence of evidence that Mr. Freeman had a qualifying disability when Allstate denied his requested accommodations.  The EEOC's case proceeds to trial on its ADA claim that Allstate wrongfully terminated Mr. Freeman because of a perceived disability.

DONE this 17th day of October, 2022.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE